## HELVEY v. HELVEY.
### No. 35429.

Supreme Court of Oklahoma.
Sept. 15, 1953.

Rehearing Denied Oct. 27, 1953.

Dick Bell, Seminole, Bill Biggers and A. C. Kidd, Wewoka, for plaintiff in error.

Harold Freeman, S. H. King, Pauls Valley, for defendant in error.

ARNOLD, Justice.

Peggy Helvey brought action against C. A. Helvey in the District Court of Coal County for divorce, custody of the minor child, and property settlement. The court entered a decree of divorce in favor of plaintiff, which was not appealed from, granted her partial custody of the minor child, and made a property settlement between the parties. Plaintiff brings this appeal making the sole contention here that the lower court did not make a fair and equitable division of the property acquired during coverture.

On this point the evidence of plaintiff is: that at the time of the marriage in 1938 defendant owned approximately 650 acres of land upon which was situated a house, which was not modern, and some cattle, the exact number of which she did not know; that the revenue stamps on the deed showed that defendant paid $4,250 in 1935 for this 650 acres; that there was a mortgage on this land of $2,500 which had been paid off since marriage; that plaintiff taught school after her marriage for about 2 years, earning $100 per month; that she spent all her income in furnishings for the house; that she had $400 in savings and a car, which she sold for $210, which she also spent on the house; that she had had two children, the first of which died at birth and the second of which, a daughter, was 6 years old at the time of trial; that since marriage the parties had acquired additional land and at the time of trial owned 2,591.74 acres; that the total cost of this land was $37,676.99; that since marriage the dwelling house had been modernized, barns and tenant houses built, farm equipment, including hay balers, sprayers, and trucks, had been purchased, all of which now had a book value based on cost less depreciation of $15,307.51; that at the time of trial the parties owned 893 cattle which cost $130,-458.44; that during 1951 the parties had

sold 1035 head of cattle at a total price of $212,530.12; that by computing the average price per head of cattle sold by defendant in 1951, which was $205.34, and multiplying this figure by the number of cattle she arrived at a figure of $183,348.62 as being the fair market value of the cattle at the time of trial; that the parties made a net profit before income taxes from their cattle business in 1948 of $30,436.92; in 1949 of $12,513.95; in 1950 of $30,698.55, or a total of $73,649.42 for these three years; that they owed Federal income taxes on this sum in the amount of $16,850.59; that the fair market value of all their real estate with improvements was $150,000; that this figure includes the 650 acres owned by defendant at the time of the marriage upon which are situated most of the improvements; that all of the improvements with the exception of the dwelling house were placed on the land during coverture; that as of November 28, 1951, the parties had assets, based on cost, of cattle, $130,458.44, land, $37,676.99, and improvements and farm machinery, $15,307.51; that they owed the National Livestock Credit Corporation $10,162.21, the Commissioners of the Land Office $856.58, and additional Federal income taxes $16,850.59; that after deducting the liabilities which she testified to from the aggregate cost of the land, cattle, and improvements the parties had a net worth of $155,573.56; that the cattle—893 head at an average sale price of $205.34,—had a fair market value of $183,348.62; the land a fair market value of $150,000; the miscellaneous assets $15,307.51, or total assets based on market value of $348,656.13; that after deducting from this amount the amounts owed the National Livestock Credit Corporation and Commissioners of the Land Office mentioned above the parties had a net worth, based on market value, of $337,637.34; that defendant had made a financial statement to National Livestock Credit Corporation in December, 1950, for the purpose of obtaining further credit from them, showing he was worth $299,000; all of the figures given above with the exception of the $150,000 given as the fair market value of the real estate were testified to by her auditor.

Defendant's evidence is that he buys and sells cattle; that he sometimes buys a carload of cattle and immediately resells them for a quick profit; that sometimes he goes in partnership with others in feeding out the cattle for market—his partner furnishing the pasture and he furnishing the cattle—the profits being equally divided between them; that he feeds out some cattle himself; that he usually had from 600 to 800 cattle of all grades, kinds, and ages; that he used the National Livestock Corporation as a bank; that he borrowed money from them to buy cattle and paid for cattle purchased by drawing drafts on this corporation, and deposited all money received from cattle sales with it; that the only records he kept were cancelled checks and deposit slips; that he calculated his income on an annual cash basis; that he is an experienced and successful cattle man; that he acquired the 650 acres upon which the dwelling house and most of the improvements were located prior to marriage, although he still owed a mortgage of $2,500 on it at the time of marriage; that his ownership of some of the land acquired since marriage was based on tax titles and some of the rest had outstanding interests which he did not own; that he would judge the land was worth on an average of $10 to $12 per acre; that he owned about 650 cattle at the time of his marriage; that he did not know what he was worth in 1938 at the time of marriage; that at the time of trial he owned approximately 893 head; that in addition he had some calves which he had raised but did not know how many or their value; that it was impossible for him to tell what the fair market value of the cattle was; that the average cost of the steers was $164, the average cost of the cows was $101, and the average selling price per head for cattle sold during 1951 was $226; that the total gross sales of cattle in 1951 amounted to $212,530; that he had spent about $2,000 on the dwelling house since marriage modernizing it; that as of December 31, 1951, he had cash, $120; 893 cattle which he had purchased at a cost of $129,759; approximately 2,633 acres of land which he had purchased at a cost of $39,177; buildings and farming equipment,

cost $13,400, less reserve for depreciation of $3,000, or $10,400, that he owed the Commissioners of the Land Office $862.24; National Livestock Credit Corporation $25,162.21; Collector of Internal Revenue for back income taxes, $26,701.94; calculated Federal income tax for 1951, $6,255; that after deducting his liabilities as hereinbefore set forth from the aggregate cost of the land, cattle, and improvements he had a net worth of $118,974.01; that his net income after taxes, both those already paid and back taxes owed, in 1947 was $13,986.-24; in 1948, $20,565.17; in 1949, $10,263.26; in 1950, $20,174.04; in 1951, $12,843, or a total net income for the past five years of $77,831.76; that this income had gone into the purchase of more land and improving the land.

At the conclusion of all the evidence the court found on the point involved here that at the time of marriage defendant owned approximately 659 acres of land, fairly well improved, and considerable personal property, including cattle; that plaintiff brought little if anything into the marriage contract in the way of property or other assets; that since the marriage the parties had increased defendant's criginal holdings to approximately 2,592 acres; that there was some question as to whether the parties owned the entire fee in all of said lands; that the evidence as to value of the real estate, personal property, and outstanding obligations and indebtedness was indefinite and vague on many points; and concluded that defendant should be given full credit for the property which he had at the time of marriage and the aid that property gave to the build-up of future acquired properties.

The court rendered judgment fixing the interest of plaintiff in all holdings of the parties in the total amount of $25,000, payable in cash as follows: $500 within 10 days from date of judgment, $9,500 within 45 days from the date of judgment, the balance at the rate of $250 per month until the full amount was paid, defendant to have the privilege of paying larger payments or discharging the full obligation in a lump sum if he so desired, and defendant to pay all taxes, including back income taxes for himself and his wife, and all other indebtedness and obligations against the property.

Defendant was ordered to pay $600 for the use and benefit of plaintiff's attorneys as temporary attorneys' fees at the beginning of this suit. Upon appeal here application was made to this court for additional attorneys' fees; this court ordered defendant to pay plaintiff for the use and benefit of her attorneys the sum of $1,500, which has been paid.

Although the evidence of plaintiff shows the market value of the entire acreage together with improvements at the time of trial, it does not show the market value of defendant's original acreage and the improvements thereon at the time of marriage separate and apart from the entire tract; and though plaintiff's evidence shows that part of the tract bought after marriage was accorded an increased value by reason of its attachment to the original tract, it does not show its separate market value; her evidence does not show how many or what grade of cattle defendant had at the time of marriage; it does show the number he owned at time of the trial—893 head—were worth $183,348.62, calculated on the average sale per head of cattle during the previous year; and although she testified that after deducting the liabilities as hereinbefore set forth from the aggregate cost of the land, cattle, and improvements defendant had a net worth of $155,573.56, her testimony is generally unsatisfactory.

Although defendant's evidence shows the market value of the land added to the original tract during coverture was $10 to $12 per acre, it does not show the value of improvements made during coverture on the original tract; although his testimony shows the cost of most of the cattle on hand at the time of trial to be $129,759, it does not show the market value thereof and does not show the number nor value of raised cattle, though he admits there were some of varying ages and kinds; and although he testified that he had a net worth of $118,-974.01 based on cost of land and cattle after deducting the liabilities testified to by him as hereinbefore set forth, his testimony generally is very unsatisfactory.

In spite of the unsatisfactory state of the record on net value of the estate we are convinced that the net value thereof acquired during coverture is far in excess of that which must have been determined by the trial judge. We think the net value of this estate was at least $100,000.

■■■ Under all the circumstances we find that plaintiff should have as an equitable division of the property the sum of $50,000 payable in cash as follows: $9,500 within thirty days of the spreading of the mandate, the balance to be paid to the Clerk of the Court at the rate of $250 per month; that she should have a lien for the unpaid balance of said sum of $50,000 on all the real estate constituting the ranch; that plaintiff should pay her attorney an attorney's fee in the sum of $5,400 in addition to the amount which said attorney has already received, to be paid as follows: $3,000 out of the lump sum of $9,500 above mentioned upon receipt of such lump sum and the balance at the rate of $50 per month out of the monthly payments of $250 above mentioned; plaintiff to receive in addition to said cash one-fourth of all the minerals remaining at the time of trial owned by the parties under all the lands acquired during coverture.

Judgment is rendered as indicated above and the trial court is directed to vacate the judgment heretofore entered by it and enter judgment in conformity with the views herein expressed.

Reversed with directions.

HALLEY, C. J., JOHNSON, V. C. J., and DAVISON, O'NEAL, and BLACKBIRD, JJ., concur.

CORN and WILLIAMS, JJ., dissent.

CORN, Justice (dissenting).

I think this case should be affirmed under the facts disclosed by the record. The record reflects that defendant owned 893 head of cattle and 2,633 acres of land, at the date the divorce was granted, of a value of about $150,000 and had liabilities as shown by the auditor's statement of $58,981.99, which indebtedness was incurred during coverture; that he owned between 600 and 700 head of cattle and 659 acres of improved land at the time of his marriage to the plaintiff. The judgment, based upon the following findings of fact, by the trial court, which is amply supported by the evidence in the record, does not appear to me to be against the clear weight of the evidence.

"The Court finds, from the evidence in this case, that the plaintiff and defendant were legally married on October 29th, 1938. The Court finds that previous to this marriage, the defendant, C. A. Helvey, had been married and raised a family of several children.

"The Court further finds that at the time of the marriage of the parties to this action, the defendant, C. A. Helvey, already owned approximately 659 acres of land, fairly well improved and was living in the home on said premises and operating a cattle business and had considerable personal property at the time of the marriage, including cattle.

"Insofar as the testimony discloses the plaintiff brought little, if anything, into the marriage contract in the way of property or other assets.

"The evidence further shows that the plaintiff and the defendant have lived together at this ranch place since their marriage until in recent months when they became estranged, and that since the marriage of the parties, lands have been purchased and added to the original holdings until at the present time the ranch consists of approximately 2592 acres, although there is some question as to whether or not the parties own the entire fee in all of said lands, and there has been a showing that titles to a part of this land may not be in first class condition and suits may be required to be brought to quiet title to some of the lands, and some payments may have to be made to claimants and heirs in order to secure the full fee title. However, the exact nature of this situation has not been brought clearly to the court.

"The testimony shows that the defendant is a man of good judgment and through his knowledge of values of land and of the cattle business, he has been able through good

management and a good understanding of business affairs, to accumulate lands and cattle and other personal property. Under the testimony it does not appear the plaintiff has ever had any experience in ranch work and had practically nothing to do with the management of the properties and the accumulation thereof, except that she was, of course, the wife of the defendant and bore a child by him that is now living, and the Court realizes that this is an important part of the relationship and has its values.

"Although there has been introduced the evidence of certified public accountants and of appraisers, there is yet some doubt in the mind of the court as to the valuation that should be placed upon the real estate and personal property and holdings of the parties to this action, and the exact indebtedness and obligations outstanding are also difficult to arrive at.

"But with the light of the testimony before the Court, the Court is of the opinion that considering all of the evidence, facts and circumstances that have been introduced in evidence, that the Court is warranted in making the award he hereinafter makes and the judgment he enters herein.

"* * * The Court finds that inasmuch as the Plaintiff has had practically no experience in the management of ranch affairs, and knows nothing about cattle business, would render it unwise to divide said ranch in order to set over a portion thereof to her. And the Court is of the opinion that to grant the plaintiff a portion of said ranch and thus split it up would result in greatly decreasing the value of said property as a ranch and would thereby be a detriment and result in a loss to both parties to this action."

The most of the property involved in this action is cattle and this court should take judicial notice of the fact that the value of cattle, since the rendition of the judgment in this case, has dropped about 50%, yet the defendant's liability to the plaintiff has not been deflated or reduced.

I cannot agree to the amount of $6,900, attorney fees awarded to plaintiff's attorneys for their services rendered on appeal in this court.

As reflected by the majority opinion the defendant was ordered by the trial court to pay plaintiff's attorneys $600, which was paid. In the motion for a new trial no complaint is made that they have not received adequate compensation for their services rendered in that court, nor do I find any evidence in the record as to the reasonable value of their services in the trial court, which even indicates that it should be more. So I take it that it is impossible for this court to allow any additional attorney fee for the services of the attorneys rendered in the trial court; as no ground has been laid for such an award.

The only assignments of error are:

"1. The erroneous order made by the District Court of Coal County in regard to the custody and support of the minor child; and,

"2. The inadequacy of the purported property settlement or property division made to the plaintiff."

After the appeal was filed in this court the plaintiff made application for attorney fees on appeal and on March 31, 1952 was allowed $1,500, for the services of her attorneys in this court to be paid by the defendant.

The majority opinion makes an additional allowance of $5,400, based solely upon the services of the attorneys in the briefing of the two above assignments of error, which has been accomplished in a thirty-nine page brief and a reply brief consisting of eight pages. Under the facts in this case as disclosed by the record which plainly indicates to me that the judgment of the trial court is not against the clear weight of the evidence, and also in the absence of testimony of attorneys showing that the services rendered by the attorneys for the plaintiff in error on appeal in this court is reasonably worth $6,900. I respectfully dissent.